669 A.2d 1172 (1995)
In re D.L.
No. 94-218.
Supreme Court of Vermont.
September 22, 1995.
*1173 Jeffrey L. Amestoy, Attorney General, and David Tartter, Assistant Attorney General, Montpelier, for State.
David J. Mullett of Cheney, Brock, Saudek & Mullett, P.C., Montpelier, for appellee M.R.
*1174 Robert A. Sheftman, Montpelier, for appellee D.H.(1).
Before ALLEN, C.J., and GIBSON, DOOLEY, MORSE and JOHNSON, JJ.
DOOLEY, Justice.
The State of Vermont appeals an order of the Washington District Court quashing subpoenas issued in connection with an inquest proceeding pursuant to 13 V.S.A. § 5131. The district court ruled that the inquest procedure, as embodied in 13 V.S.A. §§ 5131-5137, violates Chapter II, Section 5 of the Vermont Constitution. We disagree that the separation of powers provision is violated and reverse.
On October 25, 1993, a state special drug prosecutor filed an application for an inquest regarding illegal contraband. The application was granted by District Judge Dean Pineles, and the State issued subpoenas ordering three witnesses to appear at an inquest scheduled later that week. The witnesses moved to quash the subpoenas on the ground that the statutory inquest procedure violates the Vermont Constitution's separation of powers provision. In a lengthy opinion, District Judge Shireen Avis Fisher ruled that the inquest procedure violates the requirement of separation of powers. Although, as discussed in more detail below, part of the court's reasoning was based on practical considerations related to the actual functioning of the inquest, the heart of the decision is in the following excerpt:
Rather than functioning in the proper judicial role of a detached arbiter rendering a binding decision, the judge at an inquest is made a mere assistant in a process designed to render advice to a separate branch of government. The ultimate decision as to whether to prosecute remains at all times in the hands of the prosecutor, an arm of the executive branch. The judge conducting the inquest is placed in the role of being a delegate of, and assistant to, the executive branch of government, furnishing a duly intimidating setting, and allowing the judicial office to lend an air of solemnity to the process. He or she exercises no adjudicatory role.
The court granted the motions and discontinued any further proceedings in the inquest; this appeal followed.

I.
We begin our discussion by describing Vermont's inquest procedure, its history, and the history of inquests in England and other American jurisdictions. The general inquest[1] is essentially a criminal proceeding, State v. Alexander, 130 Vt. 54, 60, 286 A.2d 262, 265 (1971), designed to determine whether sufficient evidence exists to prosecute a criminal matter. See 13 V.S.A. §§ 5131-5137; see also State v. Tonzola, 159 Vt. 491, 497, 621 A.2d 243, 246 (1993). The state's attorney or attorney general initiates an inquest by applying in writing to a judge of the district or superior court. 13 V.S.A. § 5131. If the judge decides to conduct an inquest, the judge may issue "necessary process" to require witnesses to give evidence related to the investigation. Id. This process includes issuing subpoenas and exercising the court's contempt power to force recalcitrant witnesses to testify. See State v. Jurras, 97 Vt. 276, 279, 122 A. 589, 590 (1923). The statute also provides that all witnesses "shall be sworn." 13 V.S.A. § 5132. The prosecutor conducts the examination of witnesses, 13 V.S.A. § 5137, but the court may interrupt to assure that witnesses are advised of their Fifth Amendment right not to incriminate themselves. The proceeding is conducted in the utmost secrecy, and no individuals other than the stenographer, the judge, the state's attorney and the witness may be present at the inquest. 13 V.S.A. §§ 5133-5134; see Alexander, 130 Vt. at 60, 286 A.2d at 266 (participation of sheriff at inquest violated statute).[2]
*1175 Vermont's inquest procedure has been likened to the proceedings before a grand jury, but while a grand jury determines the question of probable cause, an inquest is at most a discovery procedure. Alexander, 130 Vt. at 61, 286 A.2d at 266. It is not designed to be penal or accusatory; its sole function is one of investigation. Id. at 60, 61, 286 A.2d at 265, 266. It is this nature of the inquest that is at the heart of the district court decision because criminal investigations are traditionally characterized as executive functions.
Vermont has had an inquest procedure in its law from its earliest times. Originally, it was conducted by a justice of the peace for limited purposes. As described in Harman, the authorization and procedure was as follows:
Inquests may be held before any justice of the county, in cases of death by supposed casualty or violence, and of fires maliciously set. The procedure is simple, the application being usually by word of mouth, and the papers returned being little more than the substance of the testimony of the witnesses, with an account of the expenses.
H. Harman, The Vermont Justice and Public Officer § 484, at 408 (1905). Most recently, the authorization for the justice's inquest, shifted to municipal and then district judges on the abolition of the judicial duties of the justice of the peace, was contained in 13 V.S.A. §§ 5101-5103, which were repealed in 1974.
As Harman indicates, the product of a justice's inquest was a report of "the substance of the testimony of each witness in writing" delivered to the superior court. 13 V.S.A. § 5103 (repealed). Originally, the justice conducted the proceeding, including the questioning of witnesses. In 1898, however, the Legislature provided that the state's attorney must attend the inquest "and conduct the examination." 1898, No. 117, § 1.
The justice's inquest was the Vermont adaptation of the coroner's inquest as used in England at the time of the founding of this state and widely used in other states. The English coroner was a judicial officer whose primary function was to hold inquests to investigate the causes of sudden, violent, or unnatural deaths. See State v. Knight, 84 N.C. 789, 792 (1881). The coroner conducted the examination of the witnesses, whose attendance could be compelled by the coroner by subpoena, but the decision on the cause of death was made by a jury. See Giles v. Brown, 8 S.C.L. (1 Mill Const.) 230, 231-32 (1817); see generally 7 American & English Encyclopedia of Law 606-07 (2d ed. 1898). The accused, if any, had no right to present witnesses or even be present at the inquest. See id. at 608. The decision of the jury, called an inquisition, had the status of a grand jury indictment and could be the basis of a prosecution. See id. at 610.
Although the proceedings have become archaic in more recent times, many states continued the coroner's inquest. Probably the most famous application in modern times was the coroner's inquest held in connection with the death of Mary Jo Kopechne in an automobile driven by Senator Edward Kennedy in Chappaquiddick, Massachusetts. In an appeal over procedures to be used at the inquest, the Massachusetts Supreme Judicial Court noted: "The pertinent statutory provisions exemplify a public policy that the inquest serves as an aid in the achievement of justice by obtaining information as to whether a crime has been committed." Kennedy v. Justice of the Dist. Court of Dukes County, 356 Mass. 367, 252 N.E.2d 201, 205 (1969). As in Vermont, other states often abolished the office of coroner, transferring the inquest responsibility to justices of the peace or criminal court judges. See State v. Mackles, 161 La. 187, 108 So. 410, 410-11 (1926) (justices of the peace); Kennedy, 252 N.E.2d at 204; Carrick v. Locke, 125 Wash.2d 129, 882 P.2d 173, 178 (1994) (judges).
*1176 The current Vermont inquest procedure was introduced in 1910, and has changed little since its creation. 1910, No. 221, § 1. It differs from the justice's inquest in two main ways. First, the scope of the proceeding has been greatly expanded to "any criminal matter," 13 V.S.A. § 5131, rather than the narrow scope derived from English law. Second, the role of the judge has been reduced to summoning witnesses and presiding over the proceeding. The judge gives no report on what occurred during the inquest.

II.
Like many of the American state constitutions written at the end of the eighteenth century, the Vermont Constitution contains a provision that divides power among separate branches of government.[3] See Trybulski v. Bellows Falls Hydro-Elec. Corp., 112 Vt. 1, 6-7, 20 A.2d 117, 119 (1941). The Vermont Constitution provides that "[t]he Legislative, Executive, and Judiciary departments, shall be separate and distinct, so that neither exercise the powers properly belonging to the others." Vt. Const. ch. II, § 5. The logic of this provision is deceptively simple. To apply it, we must determine the powers of each of the branches and ensure no one exercises powers belonging to another. Briefly stated, the legislative power is the power that formulates and enacts the laws; the executive power enforces them; and the judicial power interprets and applies them. See State v. Washington, 83 Wis.2d 808, 266 N.W.2d 597, 606 n. 13 (1978).
The provision states a fundamental principle of our governmental structure. The division of power serves to create a structure resistant to forces of tyranny. See United States v. Smith, 686 F.Supp. 847, 853 (D.Colo.1988). Indeed, James Madison states in the Federalist Papers that the accumulation of legislative, executive, and judicial power into one place is "the very definition of tyranny." J. Madison, The Federalist No. 47, at 302 (C. Rossiter ed. 1961).
Our decisions reflect, however, that more difficult issues and choices lie under the surface of separation of powers questions. Thus, we have emphasized that separation of powers doctrine does not contemplate an absolute division of authority among the three branches such that each branch is hermetically sealed from the others. See State v. Pierce, 163 Vt. ___, ___, 657 A.2d 192, 194 (1995); see also INS v. Chadha, 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983) (federal branches not hermetically sealed from one another). Practical realities of daily government require that there must be a certain amount of overlapping or blending of the powers exercised by the different departments. Trybulski, 112 Vt. at 6, 20 A.2d at 120. Moreover, there are many powers and functions of government that defy simple or obvious classification. Id. at 7, 20 A.2d at 120. The focus of a separation of powers inquiry is not whether one branch of government is exercising certain powers that may in some way pertain to another branch, but whether the power exercised so encroaches upon another branch's power as to usurp from that branch its constitutionally defined function. See Smith, 686 F.Supp. at 854. As stated by James Madison, "where the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free Constitution are subverted." James Madison, The Federalist No. 47, at 303-04 (C. Rossiter ed. 1961) (emphasis in original).
To determine whether the judiciary's power has been either unconstitutionally usurped or expanded, this Court has traditionally considered four factors: (1) whether the actions at issue are judicial functions or *1177 are reasonably necessary or incidental to the discharge of a judicial function, Trybulski, 112 Vt. at 8, 20 A.2d at 120-21; (2) whether the court's role in another department's affairs is merely advisory, In re Williams, 154 Vt. 318, 324, 577 A.2d 686, 689 (1990); In re Constitutionality of House Bill 88, 115 Vt. 524, 528, 64 A.2d 169, 171 (1949); (3) whether the judiciary has any discretion in accepting or rejecting the delegated actions, Granai v. Witters, 123 Vt. 468, 470-71, 194 A.2d 391, 392-93 (1963); and (4) whether the actions impair the independent institutional integrity of the judiciary. Pierce, 163 Vt. at ___, 657 A.2d at 195. We consider each of these factors in turn.

III.

A.
When actions of the judiciary overlap with the inherent powers of another branch, the first inquiry is whether the actions at issue are incidental to the discharge of a judicial function. Chioffi v. Winooski Zoning Bd., 151 Vt. 9, 11, 556 A.2d 103, 105 (1989). The mere fact that the judiciary is engaged in an action normally characterized as legislative or executive is not important as long as the action is related to a judicial function. Trybulski, 112 Vt. at 8, 20 A.2d at 120.
The application of this factor can be difficult. For example, in Chioffi v. Winooski Zoning Board, we held that the superior court's participation in the formulation of municipal zoning policy, which is normally a legislative function, was not unconstitutional. 151 Vt. at 13, 556 A.2d at 106. The court's de novo review of zoning board decisions was permissible because the zoning board acted in a "quasi-judicial" manner by granting permits, allowing zoning variances, and deciding the applicability of zoning ordinances in particular cases. Id. Separation of powers principles were not violated because the court's actions were incidental to the traditional judicial function of finding facts and applying the law to those facts Id.
Conversely, in In re Williams, we held unconstitutional a statute that required the district court to hold a full hearing on whether grounds exist to dismiss or suspend a municipal employee. 154 Vt. at 325, 577 A.2d at 689. The characterization of the actions performed by the district court was essentially judicial; the court conducted a full evidentiary hearing on the matter, determined facts, and certified its findings. Id. at 320, 577 A.2d at 687. These actions, however, were unconstitutional because the power exercised did not relate back to a judicial function. The court's action was advisory to the governing board of the municipality, which still had to decide whether to dismiss or suspend the employee and could ignore the court findings in that decision. Id. at 324, 577 A.2d at 689.
The inquest witnesses characterize the situation here as inappropriate judicial participation in the executive function of investigating crime and deciding whether to prosecute. We have detailed the history of inquests here and in other states to show that the neat compartmentalization proposed is inconsistent with the historical understanding of judicial power. Although investigatory, inquests have been viewed as the exercise of judicial power. Thus, the Supreme Court of Washington, in rejecting a challenge to that state's inquest procedure, emphasized:
Judges have been assuming the role and duties of coroners [to conduct inquests] for as long as Washington has been part of the United States. Such a long and heretofore unchallenged association between the executive and judicial branches is prima facie evidence of the constitutionality of the statute.
Carrick, 882 P.2d at 178. Similarly, the Supreme Judicial Court of Massachusetts noted the historical acceptance of inquests:
It has never been doubted that the duties of obtaining discovery and of holding inquests may properly be performed by judges. It has been said, in substance, that holding an inquest is a quasi judicial function which may be committed to administrative officers or may with propriety be placed upon the judiciary.
Lachapelle v. United Shoe Mach. Corp., 318 Mass. 166, 61 N.E.2d 8, 10 (1945); see also State v. Unnamed Defendant, 150 Wis.2d 352, 441 N.W.2d 696, 700-01 (1989) ("John *1178 Doe" proceeding, which is similar to an inquest, was in existence before adoption of state constitution, demonstrating "longstanding acquiescence in the constitutionality of this statute"). The Supreme Court of New Jersey has adopted the even broader view that the "power of investigation cannot be assigned to any one of the branches of government exclusively." Massett Bldg. Co. v. Bennett, 4 N.J. 53, 71 A.2d 327, 330 (1950). The court upheld a statute authorizing a judge, at the request of taxpayers, to conduct a summary investigation into the affairs of a municipality because "an investigation into the public affairs of a municipality or a county is . . . judicial in nature when it may lead to a civil suit for damages, or a proceeding in lieu of a prerogative writ, or a grand jury indictment or any one of a variety of statutory actions." Id.[4]
Although the role of the judiciary in criminal investigation has grown smaller over time, some involvement continues. For example, judges issue search warrants to assist the police in conducting their investigation of crime. See State v. Savva, 159 Vt. 75, 86, 616 A.2d 774, 780 (1991). In addition, the investigative function of the grand jury has historically been considered to be part of the judicial process. See Salvaggio v. Cotter, 324 F.Supp. 681, 684-85 (D.Conn.1971). Grand jury investigations in Vermont have often been the source of prosecution. Alexander, 130 Vt. at 61, 286 A.2d at 266. Indeed, grand juries have been described as institutions that have "one foot in the judicial branch and the other in the executive." In re Request for Access to Grand Jury Materials, Grand Jury No. 81-1, Miami, 833 F.2d 1438, 1444 (11th Cir.1987).
There are two other considerations in assessing this factor. In the modern inquest, the court's role is limited to exercising its subpoena power, administering oaths, protecting the rights of witnesses, and using contempt powers. These powers assure that witnesses appear to testify, and encourages them to testify truthfully. The court does not initiate the inquest investigation. It does not formulate or present questions to the witnesses. The court makes no decision regarding whether evidence of a crime is sufficient to prosecute. The court's role directly relates back to its ultimate function of neutral arbiter. See House Bill 88, 115 Vt. at 529, 64 A.2d at 172. It assures that inquests are conducted in a way that permits the State to investigate a matter without transgressing on witnesses' liberties. See Washington, 266 N.W.2d at 611. Ironically, the traditional inquest procedure, as in use in England at the time of our Constitution, raises greater separation of powers concerns than the current procedure. In that procedure, the coroner exercised powers that are now reserved to the prosecutor.[5] Indeed, the Massachusetts court has held that a violation of separation of powers would occur if the attorney general was bound by the findings of an inquest. See Shepard v. Attorney General, 409 Mass. 398, 567 N.E.2d 187, 191 n. 7 (1991); see also State v. Parker, 151 Vt. 378, 379, 560 A.2d 383, 385 (1989) (executive branch "is the exclusive charging authority").[6]
Similarly, the lack of an inquest report by the presiding magistrate reduces the concern *1179 that the judge could not fairly preside over a resulting criminal trial. The statutes specifically allow for the inquest judge to preside at trial. See 13 V.S.A. § 5132. We have upheld the statute against a claim that participation by the inquest judge denies a fair trial, noting "[t]he functions of the judge who may be called upon to conduct an inquest are such that there is even less ground to suspect prejudice than in case of a judge who has presided at a former trial, or who has participated in the trial of a different cause where the same questions are presented for consideration." Jurras, 97 Vt. at 281, 122 A. at 591.
The second consideration distinguishes Williams. The judiciary's role in that case related to disciplining or removal of government employees, a traditional executive branch prerogative. The judiciary's role in the inquest is related to criminal proceedings. Thus, we agree with the Massachusetts court that the statute "authorizes the courts to perform a function so closely connected with and so far incidental to strictly judicial proceedings that the courts in obeying the statute would not be exercising executive or nonjudicial powers." Lachapelle, 61 N.E.2d at 10.

B.
A second factor we have relied upon in a separation of powers inquiry is whether the court's participation in another branch's affairs is merely advisory. See Kennedy v. Chittenden, 142 Vt. 397, 399, 457 A.2d 626, 627 (1983); House Bill 88, 115 Vt. at 528, 64 A.2d at 172. In Williams, where the court's role was to determine the legality of potential employee discipline action before the municipality decided to impose that action, we stressed that the court's action "is merely advisory, and the legislative body of the municipality may choose to take no action even if the court has found misconduct." 154 Vt. at 324, 577 A.2d at 689.
Again, the traditional inquest procedure is more suspect under this factor than the current procedure. In the traditional procedure, the justice of the peace delivered a report that was only advisory to the charging authority. In the current inquest procedure, the court's role is narrowed but no action or decision of the judiciary is subject to the review or rejection of the executive branch. To the extent the court exercises judicial power, its decisions are final, at least until overturned within the judiciary.
We recognize in assessing this factor that the whole inquest proceeding is advisory to enable the prosecutor to make an informed charging decision. This is nothing more than saying that the function of the inquest is investigatory, and a discretionary decision must be made before the fruits of the investigation are turned into a criminal proceeding. We reiterate that involvement in investigation is a more appropriate role for the judiciary than involvement in bringing the criminal charges. See Parker, 151 Vt. at 379, 560 A.2d at 385.

C.
Another factor that is important in a separation of powers inquiry is whether the judiciary has any discretion in accepting or rejecting the delegated actions. See Granai, 123 Vt. at 470-71, 194 A.2d at 392-93. When the courts serve at the order of another branch, their independence and autonomy is compromised. See id. In Granai, we held unconstitutional a statute allowing state legislators who were involved in civil litigation to continue hearings or trials scheduled during the legislative session, because it permitted the legislature to dictate to the judiciary the terms of its internal administration. Id. at 471, 194 A.2d at 393.
Other courts considering separation of powers challenges to inquests and similar procedures have stressed this factor. For example, in Massett Bldg. Co. v. Bennett, the New Jersey court stressed that the municipal investigation statute did not create a mandatory duty so that the judge "may act in his discretion." 71 A.2d at 330 (internal quotes omitted). Similarly in Carrick v. Locke, the Washington Supreme Court relied heavily on the fact that judges could refuse to perform an inquest. See 882 P.2d at 179.
We construe the inquest statute as providing that the courts' supervision of the *1180 inquest is discretionary. See 13 V.S.A. § 5131 (upon application of state's attorney, "a judge . . . may institute and conduct an inquest") (emphasis added); 13 V.S.A. § 5132 (such "judge may issue necessary process to bring witnesses before him") (emphasis added). The plain, ordinary meaning of the word "may" indicates that the statue is permissive and not mandatory. See Medlar v. Aetna Ins. Co., 127 Vt. 337, 342, 248 A.2d 740, 744 (1968). Thus, the district and superior courts are under no obligation to conduct an inquest when requested. Because the courts are free to reject inquest applications, this third factor also weighs in favor of constitutionality.

D.
The last factor we consider is whether the independent institutional integrity of the judiciary is impaired by the responsibility for conducting inquests. See Pierce, 163 Vt. at ___, 657 A.2d at 195. This factor is most important where judicial power is encroached upon by another branch. For example, in Pierce, we used this standard to consider the validity of a statute that allowed deferred sentencing by the court only with the approval of the prosecutor. The factor can be significant, however, where additional judicial responsibilities might restrict the court's ability to perform its core functions. Thus, in Williams we expressed concern that the requirement that the court hear the personnel dispute within ten days of filing could "have serious adverse consequences for the many other litigants in the court, as well as to important public interests." 154 Vt. at 324-25, 577 A.2d at 689.
Although the district courts are facing new stresses from caseload growth, we cannot conclude that the inquest responsibility "impermissibly interfere[s] with the judiciary's core functions." Pierce, 63 Vt. at ___, 657 A.2d at 196. This follows in part from our determination that the court can refuse to hold an inquest. The statutes contain no deadlines for court action, and the court has no responsibility for post-inquest findings of fact or conclusions of law. We can take judicial notice that inquests are sought only infrequently.
In summary, our analysis of the factors that determine whether the requirement of separation of powers has been violated shows that there is no violation. Our conclusion is reinforced by the fact that decisions from other states uniformly support our result. See Lachapelle, 61 N.E.2d at 10 (inquest-like procedure for judicial investigation of alleged monopoly does not violate separation of powers requirement); Bennett, 71 A.2d at 330 (procedure for judicial investigation of affairs of municipality on request of taxpayers does not violate separation of powers requirement); Unnamed Defendant, 441 N.W.2d at 701 ("John Doe" proceeding, which is similar to inquest, does not offend separation of powers requirements); Carrick, 882 P.2d at 179 (inquest procedure does not violate separation of powers doctrine).
There remains to be considered only the trial court's decision that the reality of how inquests are conducted causes the separation of powers defect. The following is its description of this reality:
Upon request of a State's Attorney, a judge signs and issues a subpoena for a person to appear at an inquest. This witness may or may not be a person who is suspected of any wrongdoing. The subpoena is then served upon that person by a law enforcement officer, typically one in uniform and carrying a sidearm.
At the date and time specified in the subpoena, the witness appears at the courthouse. He or she is then escorted into a courtroom by an armed, and sometimes uniformed, court officer. Any person accompanying the witness is ordered to wait in the hall outside of the courtroom. Should the witness be accompanied by counsel, the attorney is also required to remain in the hallway outside of the courtroom. No member of the media is allowed in the courtroom, nor is the media allowed access at any point to a transcript of the proceedings.
The courtroom is then cleared by the court officer of all persons except the prosecutor, the judge, the stenographer, and the witness. The court officer locks the courtroom doors behind himself or herself *1181 as he or she leaves. The judge then issues to the stenographer the stenographer's oath of secrecy, a violation of which subjects the stenographer to criminal liability.
The judge then turns to the witness and informs the witness of the nature of the proceeding. The judge tells the witness that the entire inquest is secret. The witness is told that they will be subject to prosecution for perjury if they are less than truthful during the inquest. If the State has offered immunity to the witness, the judge informs the witness that he or she may not refuse to answer any questions, on penalty of a finding of contempt and possible incarceration. If the State has not offered immunity to the witness, the judge informs the witness of the constitutional privilege against self-incrimination, and attempts to explain its significance to the (usually very nervous) witness.
The prosecutor then begins questioning the witness. The burden falls solely on the judge, sua sponte, to see that the prosecutor does not, in A [sic] fit of excessive zeal, trample on the witness's fifth amendment rights. The judge must, in effect, on his or her own initiative, be on guard for the rights of the witness. Since the judge has no idea what the witness may say, these efforts are often ineffectual. If the State has given a witness immunity and the witness hesitates or refuses to respond to the prosecutor's questions, the judge is required to advise the witness again of the consequences of such noncooperation, and to hold the witness in contempt if the reluctance continues. Thus, in some circumstances, the witness sees the judge as a counselor and advisor, informing the witness of his or her rights, a role which the judge cannot ethically or practically carry out. A judge is not supposed to become involved in the giving of legal advice. . . . In other circumstances, the witness sees the judge as an intimidating tool of the prosecution. In either situation, it is impossible for the judge to maintain his or her proper role as a neutral arbiter between two parties, each of which is zealously arguing their position. Such detached neutrality is fundamental to the integrity of the judicial office.
In a later part of the opinion, the court detailed how the inquest procedure necessarily causes violations of the ethical responsibilities of the judge. The court concluded that the inquest should be replaced by "more modern and more effective discovery mechanisms."
We do not view the reality of the inquest procedure as changing our conclusion that it does not offend separation of powers requirements. We reiterate that the decision to hold an inquest is discretionary with the trial court. The practical and ethical considerations itemized above may in any given case induce a refusal to honor the request for an inquest.
Reversed and remanded.
NOTES
[1] We use the term general inquest to distinguish the inquest into criminal matters used here from the more narrow inquest into the cause and manner of death formerly authorized by 13 V.S.A. §§ 5101-5103, now repealed.
[2] Archer Mayor, author of the popular "Joe Gunther" detective mysteries, has summed up the inquest procedure in his 1990 novel, Border Lines. Observed Mayor: "[The inquest] is a secret criminal proceeding in which almost anybody and his uncle can be sebpoenaed [sic] to appear before a judge to answer questions from the State's Attorney. The person so summoned cannot bring his or her lawyer into the courtroom, although they can leave the room and consult with their lawyer outside if and when they like, but if they do not answer or cooperate with the process, the judge can order them jailed for contempt. In the short run, inquests give frustrated cops a moment of joy. . . ." A. Mayor, Border Lines, 253-54 (1990).
[3] Although the United States Constitution does not contain an explicit separation of powers provision, the United States Supreme Court has derived a separation of powers requirement from the statements of the powers of each of the branches. See, e.g., Bowsher v. Synar, 478 U.S. 714, 721-22, 106 S.Ct. 3181, 3185, 92 L.Ed.2d 583 (1986). We have often relied upon federal separation of powers jurisprudence in developing our own. See Trybulski v. Bellows Falls Hydro-Elec. Corp., 112 Vt. 1, 7, 20 A.2d 117, 120 (1941); see also In re Constitutionality of House Bill 88, 115 Vt. 524, 529, 64 A.2d 169, 171-72 (1949) (noting that judicial power of both Vermont and Federal Supreme Courts is same). Thus, this opinion will draw on federal case law for analysis and support.
[4] Bennett also has an alternative rationale that nonjudicial investigatory functions can be undertaken by the judiciary, as legislative agents, as long as they do not "interfere with the functioning of the courts either in the amount of time or attention they detract from judicial activity or in involving the courts in situations which may reflect on their reputation in the community for fairness, impartiality and independence." 71 A.2d at 331. We do not adopt this alternative rationale.
[5] Although the Vermont justice of the peace did not generally have all of the powers of the English coroner, expansive powers existed in some instances. Thus, a justice could arrest and detain until trial a person who disturbed a religious meeting and was a rioter, and could seize counterfeit bills and notes and the implements used to create them. See M.L. Bennett, The Vermont Justice Being a Treatise on Civil and Criminal Jurisdiction of Justices of the Peace 649 (1864).
[6] Although, in modern times, certain public officials, particularly the state's attorney elected in each county, have been the exclusive charging authorities, we have in the past recognized the right of private persons to start criminal prosecutions. Private prosecution was rare, however, because it was "clogged with such conditions." H. Harman, The Vermont Justice and Public Officer § 585, at 476 (1905).