**Alfred BISHOP**

**v.**

**STATE of Rhode Island.**

**No. 94-317-M.P.**

Supreme Court of Rhode Island.

Nov. 29, 1995.

John F. Cicilline, Providence, for Plaintiff.

James R. Lee, Special Asst. Atty. General, Aaron Weisman, Asst. Atty. General, for Defendant.

**OPINION**

BOURCIER, Justice.

This case comes before us on the state's petition for certiorari.

On February 19, 1993, the State Parole Board (board) rescinded a previously granted contingent and conditional future parole release date for Alfred Bishop (Bishop) and denied him parole. Bishop responded by filing an application for postconviction relief in the Superior Court. In that application the State of Rhode Island is the sole defendant.

**I**

**Case Travel**

Bishop was convicted of first degree murder on December 12, 1974. He was sentenced to life imprisonment. His appeal was denied, and his conviction and sentence were affirmed by this court on January 6, 1982. *State v. Bishop*, 439 A.2d 255 (R.I.1982).

On September 1, 1984, Bishop came before the board for parole consideration, and at that time his parole hearing was continued until December 1988 for the reason that he had not yet served the minimum fifteen years of his life sentence pursuant to board-adopted guidelines. On April 28, 1988, Bishop's parole request was denied because the board believed that as of that date "the time served did not appropriately take into account the seriousness of the charge." Bishop next appeared before the board on November 28, 1988, and again he was denied parole because the board believed that he should first "move through the system," which meant being reclassified from medium to minimum security status and eventually being part of a work-release program. On April 26, 1989, Bishop again came before the board, and at that time the board agreed to a conditional future release date sometime in April of 1992 on the condition or contingent upon Bishop's being able to "move through the system."

On April 30, 1992, Bishop once again appeared before the board, but when the board learned that he had made no "movement through the system," his case was continued for three months so as to permit the board to inquire of George Vose, the director of the Department of Corrections (director), why Bishop had not been reclassified. After a number of additional continuances, a parole hearing began in February of 1993. During that board hearing process, Bishop was rep-

resented by counsel. Over the course of several board hearings, the board heard testimony from the Governor's office, the Attorney General's office, and the State Police. The board was also presented with records of authorized telephone wiretap logs, summarizing telephone communications between Bishop and others that had been monitored by the State Police. Those logs indicated that Bishop, while imprisoned, was actively talking and dealing with known criminals, one of whom, Robert Papa, was actually plotting a crime at the time of his communicating with Bishop.

In addition to the above evidence, the board was also made privy to a confidential intelligence report concerning Bishop's activities at the prison, from the Department of Corrections. The parole hearings were completed on or about February 19, 1993, and at that time the board voted unanimously to rescind its earlier "contingent" parole release date and denied Bishop's parole request. The board gave as reasons for its rescission and denial action the fact that Bishop had not been reclassified out of medium security, that the board was unable to determine if Bishop was prepared to return safely and productively to the community and, finally, that Bishop continued to associate with known criminals, not part of the prison-inmate population. The board then informed Bishop that it would reconsider his parole request in eighteen months.

## II

### Bishop's Postconviction Application

Bishop asserts in his application for postconviction relief that the board and the director "unlawfully and capriciously combined" on February 19, 1993, to rescind his previously granted "contingent" parole release date. He asserts that by virtue of G.L.1956 (1994 Reenactment) § 13–8–14.1, he had a cognizable liberty interest in his contingent parole release date and that

"[t]he resicion [sic] of applicant's parole of February 19, 1993, is otherwise subject to collateral attack upon ground of alleged error heretofore available under any common law, statutory or other writ, motion, petition proceeding or remedy."

In the Superior Court, the state filed its answer to Bishop's application. It also filed a motion for summary judgment, contending that Bishop had no cognizable protected liberty interest in the prison-inmate classification system under our state statutes. That motion challenged the Superior Court's subject matter jurisdiction to litigate and reexamine the director's exclusive statutory discretion with regard to Bishop's inmate classification and housing while confined in the Adult Correctional Institutions. The state's motion was denied. Bishop's counsel then proceeded to notice the depositions of the parole board chairman, Kenneth Walker (Walker) and the director. Walker's deposition was taken; the director's was not, pending disposition of the state's petition for certiorari.

## III

### Bishop's Liberty Interest

We recognize that Bishop does have a constitutionally protected liberty interest in this state's parole system resulting from the enactment of G.L.1956 (1994 Reenactment) § 13–8–14.1. The United States Supreme Court in *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), the United States District Court for the District of Rhode Island in *Petrarca v. State of Rhode Island,* 583 F.Supp. 297 (D.R.I.1984), and this court in *State v. Tillinghast,* 609 A.2d 217 (R.I.1992), have all recognized that liberty interest.

What Bishop overlooks, however, is that he has no presently acknowledged or recognized liberty interest in this state's prison-inmate classification housing procedure. We initially point out that a protected liberty interest in the prison-inmate classification system in this state may arise from either the Fourteenth Amendment due process clause itself, or may come about from our state statutes, as, for example, from the enactment of § 13–8–14.1 with regard to parole procedures. We accordingly must first determine whether Bishop does in fact have a protected liberty interest in the state prison classification process,

and if we find that he has, then to next decide whether sufficient procedural safeguards were used in that classification process to ensure that any deprivation of that interest was not arbitrary. *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). That interest we look for must of course amount to more than just Bishop's "unilateral hope," *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981), and amount to an actual entitlement. *Kentucky Department of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989).

Our statutory prison-inmate classification system is strikingly similar to that in use in the State of Hawaii. In *Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), Hawaii's statute was examined by the United States Supreme Court. The Supreme Court clearly indicated that there is no prisoner-inmate liberty interest created when, as in our statute, G.L.1956 (1993 Reenactment) § 42–56–31, the director of the Department of Corrections is given total and exclusive *final* discretion in the classification and housing of persons committed to his custody. In particular, there is no such interest that will permit a prisoner to judicially reexamine, review, and second-guess the director's exclusive and final discretion with regard to prison-inmate classification. In *Olim,* the United States Supreme Court noted that if the classification decision-maker is not

" 'required to base its decision on objective and defined criteria,' but instead 'can deny the requested relief for any constitutional-

ly permissible reason or for no reason at all' * * * the State has not created a constitutionally protected liberty interest." *Olim,* 461 U.S. at 249, 103 S.Ct. at 1747, 75 L.Ed.2d at 823 (quoting *Connecticut Board of Pardons v. Dumschat,* 452 U.S. at 467, 101 S.Ct. at 2466, 69 L.Ed.2d at 167 (Brennan, J. concurring)).

Indeed, this court in *State v. Dowell,* 623 A.2d 37 (R.I.1993), implicitly found, consistent with *Olim,* that the director has unfettered final discretion over the classification and housing of prison-inmates in this state. However, in *Dowell,* the question of whether the director's prison-inmate classification decision was reviewable by an application for postconviction relief was left undecided.

In light of *Olim,* 461 U.S. at 249, 103 S.Ct. at 1747, 75 L.Ed.2d at 823, and *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), and in particular recognizing the clear legislative policy pronouncement in § 42–56–31,[1] we conclude that Bishop has no constitutional or statutory protected liberty interest in the present prison-inmate classification process used in this state.[2]

The classification and housing of prison-inmates in Rhode Island is regulated by §§ 42–56–30, 42–56–31, and 42–56–32. Section 42–56–31, which sets out the duties of the prison classification board, requires the board to review the "studies" made of each inmate and to recommend to the director a security classification and rehabilitation program for each inmate. The director is then required to review the board's recommendation and if approved by the director, it is then put into effect. In those instances where the director disapproves the recommendation, the director is then required to

---

**1.** General Laws 1956 (1993 Reenactment) § 42–56–31 provides:

"**Determination of Classification and rehabilitation programs of prisoners.**—It shall be the duty of the classification board to review all studies made of each prisoner during the period of his or her reception and from time to time thereafter as shall be necessary to further the purposes of this chapter; and to recommend to the director the security classification and rehabilitation program for the person. The director or his or her designee shall review the recommendation and if he or she shall approve it he or she shall cause the recommendation to be put

into effect. In the event he or she shall disapprove the recommendation he or she shall request the board to make further study and review. In the event thereafter the director or his or her designee shall disapprove further recommendation, *the decision shall be final.*" (Emphasis added.)

**2.** While it has no precedential significance, it might be interesting to note, *Carillo v. Moran,* 1993 WL 389383 (D.R.I. Aug.11, 1993), wherein the United States District Court for the District of Rhode Island found that the State of Rhode Island created no protected liberty interest in its prison classification system.

send the disapproved recommendation back to the board for its further study, review and sequential recommendation. If the director once again disapproves the board's recommendation as to the inmate's classification, the statute explicitly states that the director's "decision shall be final."

It appears clear to us from the language used in the inmate classification statutes under review that the director of the Department of Corrections has unfettered discretion in the inmate-housing classification process.

A protected state-created liberty interest within the meaning of the due process clause of the Fourteenth Amendment arises only when a state places substantive limits on official discretion, which require that a particular "outcome be reached upon a finding that the relevant criteria have been met." *Kentucky Department of Corrections*, 490 U.S. at 462, 109 S.Ct. at 1909, 104 L.Ed.2d at 516. Unlike the Pennsylvania statute reviewed in *Hewitt*, 459 U.S. at 467–68, 103 S.Ct. at 869–70, 74 L.Ed.2d at 685–86 where prescribed procedures for segregating prison-inmates were outlined, Rhode Island has not enacted any statute or regulation that gives rise to any statutory inmate liberty interest in its prison-inmate classification system.

We can hardly improve upon the cogent reasoning used by the United States Supreme Court in *Hewitt* when passing upon the issue presently under consideration.

"We have repeatedly said both that prison officials have broad administrative and discretionary authority over the institutions they manage and that lawfully incarcerated persons retain only a narrow range of protected liberty interests. As to the first point, we have recognized that broad discretionary authority is necessary because the administration of a prison is 'at best an extraordinarily difficult undertaking,' *Wolff v. McDonnell, supra*, [418 U.S. 539] at 566 [94 S.Ct. 2963 at 2980, 41 L.Ed.2d 935 (1974)], and have concluded that 'to hold * * * that any substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts.' *Meachum v. Fano, supra*, [427 U.S. 215] at 225 [96 S.Ct. 2532 at 2538, 49 L.Ed.2d 451 (1976)]. As to the second point, our decisions have consistently refused to recognize more than the most basic liberty interests in prisoners. 'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' *Price v. Johnston*, 334 U.S. 266, 285 [68 S.Ct. 1049, 1060, 92 L.Ed. 1356] (1948). Thus, there is no 'constitutional or inherent right' to parole, *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 7 [99 S.Ct. 2100, 2103, 60 L.Ed.2d 668] (1979), and 'the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison,' *Wolff v. McDonnell, supra*, at 557 [94 S.Ct. at 2975], despite the undoubted impact of such credits on the freedom of inmates. Finally, in *Meachum v. Fano, supra*, at 225 [96 S.Ct. at 2538], the transfer of a prisoner from one institution to another was found unprotected by 'the Due Process Clause in and of itself,' even though the change of facilities involved a significant modification in conditions of confinement, later characterized by the Court as a 'grievous loss.' *Moody v. Daggett*, 429 U.S. 78, 88, n. 9 [97 S.Ct. 274, 279, n. 9, 50 L.Ed.2d 236] (1976). As we have held previously, these decisions require that '[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.' *Montanye v. Haymes*, 427 U.S. 236, 242 [96 S.Ct. 2543, 2547, 49 L.Ed.2d 466] (1976). See also *Vitek v. Jones*, 445 U.S. 480, 493 [100 S.Ct. 1254, 1263, 63 L.Ed.2d 552] (1980).

It is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily

contemplated by a prison sentence. The phrase 'administrative segregation,' as used by the state authorities here, appears to be something of a catchall: it may be used to protect the prisoner's safety, to protect other inmates from a particular prisoner, to break up potentially disruptive groups of inmates, or simply to await later classification or transfer. See 37 Pa.Code §§ 95.104 and 95.106 (1978), and n. 1, *supra*. Accordingly, administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration. This conclusion finds ample support in our decisions regarding parole and good-time credits. Both these subjects involve release from institutional life altogether, which is a far more significant change in a prisoner's freedoms than that at issue here, yet in *Greenholtz* and *Wolff* we held that neither situation involved an interest independently protected by the Due Process Clause. These decisions compel an identical result here." *Hewitt*, 459 U.S. at 467–68, 103 S.Ct. at 869–70, 74 L.Ed.2d at 685–86.

Bishop, as we have already noted, does have a Fourteenth Amendment protected liberty interest in the state's parole system. We find that he does not, however, have such a liberty interest in the Department of Correction's classification or housing system. We find that no additional liberty interest right was created by the mere fact that Bishop's classification was one of the reasons given by the parole board for its denial of his parole. Bishop cannot piggyback his parole liberty interest onto the prison classification system by alleging that the director is a part of the parole proceeding and then make the director a party to his postconviction application. The parole board has no legal authority or right to demand or to require that the director classify or reclassify Bishop to any particular classification. That fact should be implicit from our order in *State v. Dowell*, 623 A.2d 37 (R.I.1993). The board likewise has no right to demand or to require the director's explanation for his final classification decision. Neither has Bishop. In his postconviction proceeding Bishop is attempting to do just that. He is attempting to investigate, by deposition discovery, official confidential administrative matters and to re-examine and litigate the director's decision not to downgrade his prison classification status. That he cannot do. He cannot, under the guise of postconviction relief, side-step the director's statutorily exclusive discretion on classification of prison-inmates and transpose the Superior Court into an appellate prison-inmate classification board.

Having disposed of Bishop's alleged liberty interest in the prison classification system process, we should nonetheless add, that notwithstanding his lack of any such protected interest, both the parole board and the director, during and after his parole board hearings, did make known to Bishop and his counsel the reasons for their respective decisions. In fact, Bishop has recited those reasons in his affidavit filed in support of his postconviction application. We find those reasons to be more than amply supported by the record before us and would, in conjunction with his hearings, have clearly satisfied any alleged Fourteenth Amendment protected liberty interest, if one in fact had existed.

Under *State v. Tillinghast*, 609 A.2d 217 (R.I.1992), Bishop, in his parole board proceeding, was entitled to a fair hearing and he was additionally entitled to be informed of the board's reasons for his parole denial. All of that he was given, and the *Tillinghast* requirements have been met.

For the reasons herein set out, we find that the trial justice erred in concluding that Bishop had a protected liberty interest in the prison classification decision made by the director. The state's petition for certiorari is granted, and we quash the order of the Superior Court that denied the state's motion for summary judgment and the order requiring Director Vose to be deposed.

The case is remanded to the Superior Court with directions to enter summary judgment for the state.