## Gordon Parker and Robert Bailey On Behalf of Themselves and Others Similarly Situated v. John Gorczyk, Commissioner, Vermont Department of Corrections

[744 A.2d 410]

No. 97-347

Present: **Dooley, Morse, Johnson and Skoglund, JJ., and Cashman, D.J., Specially Assigned**

Opinion Filed October 29, 1999

Motion for Reargument Denied December 23, 1999

264

*Jeffrey Dworkin,* Montpelier, for Plaintiffs-Appellees.

*William Sorrell,* Attorney General, Montpelier, and *Joseph L. Winn,* Assistant Attorney General, Waterbury, for Defendant-Appellant.

**Skoglund, J.** Plaintiffs, two inmates incarcerated at the Woodstock Regional Correctional Facility, brought this class action seeking to enjoin defendant, the Commissioner of the Department of Corrections, from implementing a policy that would make prisoners convicted of violent felonies ineligible for furlough until the expiration of their minimum sentences. Based on its conclusion that the policy violated plaintiffs' right to due process guaranteed by Chapter I, Article 10 of the Vermont Constitution, the Windsor Superior Court permanently enjoined defendant from implementing the policy or adopting any other policy that would prevent the Department from making individualized furlough assessments for each prisoner. Because we conclude that the challenged policy does not violate statutory law or contravene plaintiffs' right to due process or equal protection of the law under the Vermont Constitution, we reverse the superior court's decision.

The material facts are not in dispute. As of January 1995, the Department's Offender Classification Manual provided as follows:

> Extended furlough should be granted as part of an offender's reintegration plan and should occur during the 90 days prior to the offender's minimum release date. Extended furlough to a residential treatment, educational, or vocational program may be granted up to 6 months prior to an offender's minimum release date.

On January 24, 1995, the Commissioner amended this provision by adding the following sentence:

> *Exception: offenders incarcerated for felony violence are not eligible for release on Furlough until they have reached their minimum release date.*

(Emphasis in original.) The Commissioner explained that the change was aimed at serving and protecting the public, and at bringing the Department's policy in line with public expectations concerning truth in sentencing and protection from violent offenders.

In April 1995, inmates Gordon Parker and Robert Bailey filed suit on behalf of themselves and similarly situated prisoners, asking the superior court to declare the new regulation unconstitutional and to enjoin the Commissioner from enforcing it. Plaintiffs alleged that the regulation constituted an abuse of discretion, violated their rights to due process and equal protection of the law under the federal and Vermont constitutions, and was not promulgated in accordance with the Vermont Administrative Procedure Act (APA), in violation of 3 V.S.A. §§ 801-849.* At a hearing on plaintiffs' request for a preliminary injunction, the parties presented evidence on (1) the history and rationality of the new policy; (2) the impact of the policy on prisoners' chances of being granted parole upon the expiration of their minimum sentences; and (3) the specific impact of the policy on each plaintiff. Following the hearing, the superior court dismissed plaintiffs' due process claims, but granted preliminary injunctive relief based on its conclusion that plaintiffs had demonstrated a likelihood of success on their APA claim.

The parties then filed cross-motions for summary judgment after stipulating that they would not be presenting any additional evidence and that the evidence submitted at the preliminary hearing could be considered for a final ruling on the merits. In their motion, plaintiffs

---

*Plaintiffs have not argued here on appeal that the Commissioner's challenged regulation was promulgated in violation of the Administrative Procedure Act, and thus we do not address that issue.

asked the court to reinstate their due process claim in light of the analysis contained in a recent United States Supreme Court case, *Sandin v. Conner*, 515 U.S. 472 (1995). The motion was initially denied, but following the rotation of a new judge into the superior court, plaintiffs filed a motion to reconsider. In August 1996, the successor judge reinstated plaintiffs' due process claim and declared that the Commissioner's change in furlough policy violated plaintiffs' right to due process guaranteed by the Vermont Constitution.

The court's decision was based on its conclusion that Vermont's furlough statute, 28 V.S.A. § 808, requires the Commissioner to exercise his discretion by making an individualized assessment of furlough eligibility for each inmate. In the court's view, by categorically barring furlough for a specified class of inmates before they served their minimum sentences, the new policy eliminated the Commissioner's statutorily mandated discretionary role in determining furlough eligibility, and thus constituted an abuse of discretion and a violation of due process. Accordingly, the court enjoined defendant from implementing the new regulation and from adopting any other policy that would allow him to deny furlough without making an individualized assessment of each prisoner under § 808(a).

On appeal, the Commissioner argues that plaintiffs have no due process right, either directly under Chapter I, Article 10 of the Vermont Constitution or indirectly through Vermont's furlough statute, to individualized assessments of their furlough eligibility before serving their minimum sentences. In response, plaintiffs ask this Court to uphold the superior court's determination that the challenged regulation violates both § 808 and their right to due process of law under the Vermont Constitution. Plaintiffs also argue in the alternative that the regulation violates their right to equal protection under the Vermont Constitution.

## I.

Because we generally address constitutional issues only when necessary, and because the superior court grounded its due process analysis on its determination that the challenged policy violates Vermont's furlough statute, we first consider the parties' statutory arguments. Section 808(a) provides as follows:

> The commissioner *may* extend the limits of the place of confinement of an inmate at any correctional facility *if in the judgment of the commissioner the inmate will honor his*

*trust,* by authorizing the inmate under prescribed conditions to visit a specifically designated place or places for a period not to exceed 15 days and return to the same facility. An extension of limits *may* be granted:

(1) To visit a critically ill relative; or

(2) To attend a funeral of a relative; or

(3) To obtain medical services; or

(4) To contact prospective employers; or

(5) To secure a suitable residence for use upon discharge; or

(6) For any other reason consistent with the rehabilitation of the inmate.

(Emphasis added.) The superior court held that this statute requires the Commissioner to exercise his judgment by making an individualized assessment for each inmate to determine whether "the inmate will honor his trust" and thus be placed on furlough.

In support of this ruling, plaintiffs argue that if the Commissioner automatically denies furlough for a specified category of inmates, then furlough will not have been granted or denied based on whether each of those inmates "will honor his trust." Further, plaintiffs argue that only by individually assessing each inmate can the Commissioner rationally determine whether any of the six specified statutory criteria warrant granting furlough for particular prisoners. Plaintiffs contend that their view is supported by other related statutory provisions denoting the purposes of the Department and the responsibilities of the Commissioner. See 28 V.S.A. § 1(b) (Department shall strive to develop and implement comprehensive program that will confine frequent dangerous offenders but will seek to prepare offenders for reintegration into community); 28 V.S.A. § 102(c)(3), (8) (among responsibilities of Commissioner is to establish "a program of treatment designed as far as practicable to prepare and assist each inmate . . . to participate as a citizen of the state and community," and "to establish a program for each inmate upon his commitment to the facility and to review the program of each inmate at regular intervals and to effect necessary and desirable changes in the inmate's program of treatment"). Finally, according to plaintiffs, the fact that, functionally, each inmate's chances of obtaining parole depend upon his having achieved furlough status demonstrates that the Legislature intended § 808(a) to require individualized assessments with respect to that status.

We are not persuaded by these arguments. First, we find no language in § 808(a) entitling each inmate to an individualized furlough assessment before his minimum release date. The statute provides that the Commissioner "may" grant furlough "if in the judgment of the commissioner the inmate will honor his trust." Thus, the Commissioner is not required to grant furlough even if he determines that "the inmate will honor his trust." As this Court stated in *Conway v. Cumming*, 161 Vt. 113, 118, 636 A.2d 735, 738 (1993), § 808(a) contains "no limitations on the discretionary authority granted to the Commissioner."

More significantly, even assuming that § 808 required an individualized assessment of each inmate's furlough eligibility, it contains no limitations on the Commissioner's discretion in determining when to make such individualized assessments. The Legislature knows how to impose such limitations, but chose not to do so with respect to the furlough statute. Cf. 28 V.S.A. § 501(2) ("If the inmate's sentence has a minimum term, the inmate shall be eligible for parole consideration after the inmate has served the minimum term of the sentence less any reductions in term for good behavior.").

■ The challenged policy sets forth eligibility requirements that prevent plaintiffs from obtaining furlough prior to completion of their minimum sentences, but does not preclude the Commissioner from exercising his discretion regarding furlough on an individual basis once those requirements are met. Thus, by delaying individual furlough assessments for inmates convicted of violent felonies until those offenders have completed their minimum sentence, the Commissioner is not exercising his discretion in a manner inconsistent with § 808(a) or the statutory criteria contained therein. Cf. *Burbo v. Department of Social Welfare*, 157 Vt. 664, 665, 599 A.2d 1045, 1046 (1991) (department abused its discretion by failing to follow own regulation giving it discretion to set welfare recoupment rates in individual cases). Accordingly, the superior court erred in concluding that the challenged policy violated § 808(a). See *State v. O'Neill*, 165 Vt. 270, 275, 682 A.2d 943, 946 (1996) (unless necessary to effectuate legislative intent, judiciary may not read something into statute that is not there).

■ Sections 1 and 102, cited by plaintiffs, do not compel us to construe § 808(a) as mandating individual furlough assessments for each inmate prior to the inmate's minimum release date. Those statutes merely set forth the general goals of our penal institutions,

which include protection of the public from violent offenders as well as rehabilitation and reintegration into the community.

■ Further, we reject plaintiffs' attempt to bootstrap their right to parole consideration following completion of their minimum sentences onto § 808(a) so as to create an otherwise nonexistent statutory right to an individualized furlough assessment prior to their minimum release dates. Cf. *Bishop v. State*, 667 A.2d 275, 279 (R.I. 1995) (inmate "cannot piggyback his parole liberty interest onto the prison classification system"). The fact that parole determinations may ultimately be affected by whether prisoners have been granted furlough does not compel us to read § 808(a) as requiring the Commissioner to provide an individual furlough assessment before each inmate reaches his minimum release date. As the Court of Appeals for the Second Circuit stated in an analogous context concerning federal law:

> Although the Attorney General may . . . grant furloughs of up to 30 days, and permit a prisoner to work outside a prison or engage in community activities, subject to certain conditions, he is under no statutory obligation to exercise any of these powers with respect to any prisoner. It may be true . . . that a [Central Monitoring Case] designation in practice delays or precludes a prisoner from being favorably considered for furloughs, transfers, work releases, participation in community activities and even early parole, but the fact remains that these freedoms are mere possibilities, like an unclassified prisoner's prospect of release on parole, with no prisoner (CMC or not) able to prove any state of facts which would entitle him to these freedoms. Non-CMC status, in other words, merely gives a prisoner a greater chance of enjoying these freedoms, it does not guarantee them.

*Pugliese v. Nelson*, 617 F.2d 916, 923-24 (2d Cir. 1980) (citations omitted).

■ We also reject plaintiffs' argument that the Commissioner acted beyond his authority in basing the challenged policy on his concerns over the public's allegedly incorrect perception that violent crime is on the increase. The Commissioner has general authority to "establish and administer programs and policies for the operation of the correctional facilities of the department, and for the correctional

treatment of persons committed to the custody of the commissioner." 28 V.S.A. § 102(b)(2). More specifically, the Commissioner is charged with making rules and regulations for the governing of and treatment of inmates, see *id.* § 102(c)(1), and for establishing a system of classification of inmates, see *id.* § 102(c)(8). Without doubt, the Commissioner acted within the authority conferred upon him by the Legislature in promulgating the challenged policy. See, e.g., *White v. Fauver*, 530 A.2d 37, 41 (N.J. Super. Ct. App. Div. 1987) (public's perception of safety must be considered because public confidence that safety is not jeopardized is essential component to any prison program attempting to rehabilitate prisoners through supervised interaction with community).

## II.

Having determined that the challenged policy does not violate § 808(a), we now turn to plaintiffs' claim that the policy violates their right to due process. Plaintiffs' due process claim is brought under the Vermont Constitution. Because our jurisprudence in this area has relied heavily on that of the United States Supreme Court, and plaintiffs ask us to adopt a test stemming from earlier Supreme Court decisions, we briefly review the relevant due process jurisprudence of both the United States Supreme Court and this Court before addressing plaintiffs' arguments as they apply to this particular case.

## A.

The United States Supreme Court has recognized that prisoners are not "wholly stripped" of constitutional protections following their criminal convictions. See *Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974). In *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972), the Court articulated the "grievous loss" standard, holding that because the grant of parole confers a significant liberty interest upon parolees, the termination of that interest constitutes a "grievous loss" that calls for some orderly process, however informal. In arriving at this holding, the Court stated that procedural protections are due to the extent that an individual will suffer a grievous loss, which depends not merely on the "weight" of the individual's interest, but on "whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." *Id.* at 481; see also *Young v. Harper*, 520 U.S. 143, 151-52 (1997) (concluding that program employed by State of Oklahoma to reduce prison

overcrowding was sufficiently like parole, and distinguishable from furlough, to require procedural protections set forth in *Morrissey*).

In a later case involving a challenge to a prison transfer, the Court emphasized that the "determining factor" in a procedural due process analysis "is the nature of the interest involved rather than its weight." *Meachum v. Fano*, 427 U.S. 215, 224 (1976). The Court explicitly rejected the notion that "*any* change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause." *Id.* To hold otherwise, the Court warned, "would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." *Id.* at 225.

The Court continued to apply these principles in *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1 (1979), where inmates claimed that they had been unconstitutionally denied parole. The Court rejected the inmates' claim that they were entitled to protection directly under the Due Process Clause, holding that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Id.* at 7. In arriving at this holding, the Court distinguished between parole release and parole revocation, stating that "[t]here is a crucial distinction between being deprived of a liberty one has . . . and being denied a conditional liberty that one desires." *Id.* at 9. The Court pointed out the inherent difference between revocation decisions, which generally depend on proving specific facts, and release decisions, which involve a more subtle and subjective assessment of a multitude of factors. See *id.* at 9-10. Nevertheless, though finding no constitutional protection directly under the Due Process Clause, the Court concluded that the unique language of the Nebraska parole statute created a liberty interest that was entitled to protection under the Fourteenth Amendment. See *id.* at 12. The dissent argued that the existence of a parole system providing the possibility of early release does implicate a liberty interest under the Fourteenth Amendment and therefore requires due process protections with respect to parole-release decisions regardless of the uniqueness of Nebraska's statute. See *id.* at 19, 23 (Powell, J., concurring in part and dissenting in part) (Marshall, J., dissenting).

After *Greenholtz*, the Court increasingly focused on the language of particular state statutes or regulations to determine whether there existed state-created liberty interests entitled to protection under the

Due Process Clause. See, e.g., *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983) (parsing language of prison regulation led Court to hold that discretionary language of transfer decision negated any state-created liberty interest); *Hewitt v. Helms*, 459 U.S. 460, 471-72 (1983) (finding that mandatory language of prison regulation had created protected liberty interest).

In *Sandin v. Conner*, however, the Court renounced its growing tendency to focus on the language of particular regulations rather than on the nature of the deprivation, see 515 U.S. at 481, complaining that the former methodology had "encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements." See *id.* at 480-81. While maintaining its long-standing position that the Due Process Clause alone does not create a liberty interest in being free from state action while under sentence, see *id.* at 480, the Court pronounced that state-created liberty interests protected by the Due Process Clause would be limited to freedom from restraints imposing "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. The Court then held that the alleged deprivation in that case — discipline in segregated confinement — did not present the type of deprivation which infringed upon a liberty interest. See *id.* at 486.

## B.

As noted, plaintiffs' due process claim is brought under the Vermont Constitution, which provides that no person can "be justly deprived of liberty, except by the laws of the land." Vt. Const. ch. I, art. 10. "[A]s final interpreter of the Vermont Constitution, this Court has final say on what process is due in any given situation." *State v. Brunelle*, 148 Vt. 347, 350, 534 A.2d 198, 201 (1987). Nevertheless, the term "laws of the land" in Article 10 is synonymous with the term "due process of law" contained in the Fourteenth Amendment of the United States Constitution, see *id.*, and, as such, our own due-process jurisprudence has relied heavily on that of the United States Supreme Court even when our decisions were ultimately based on the Vermont Constitution.

For example, in *G.T. v. Stone*, 159 Vt. 607, 610-11, 622 A.2d 491, 493 (1992), this Court relied on the analysis contained in *Morrissey* and other federal cases in concluding that a patient conditionally released from commitment to a mental hospital has a liberty status that cannot be terminated without due process of law. Although we reached our decision under both the United States Constitution and on indepen-

dent grounds under the Vermont Constitution, we added little to our state constitutional analysis, other than noting that the Vermont Constitution explicitly provides that people enjoy freedom from restraint as a natural, inherent and unalienable right. See *id.* at 613, 622 A.2d at 494. In more recent cases, we have adopted the same pattern of basing our due process analysis on federal case law before making an independent determination under the Vermont Constitution. See *Mullin v. Phelps*, 162 Vt. 250, 263, 647 A.2d 714, 721 (1994) (holding that finding of sexual abuse by mere preponderance of evidence is insufficient process for court in divorce case to terminate all parent-child contact; emphasizing that although due process analysis relied heavily on United States Supreme Court case, holding was grounded on Chapter I, Article 10 of Vermont Constitution); *LaFaso v. Patrissi*, 161 Vt. 46, 51, 633 A.2d 695, 698-99 (1993) (applying test from *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), to determine that preponderance-of-evidence standard of proof is required in prison disciplinary hearings to satisfy due process under both Vermont and federal constitutions).

## C.

Plaintiffs contend that they should prevail under any of the due process tests applied over the years, but ask this Court to adopt the "grievous loss" test stated in *Morrissey*. See 408 U.S. at 481-82; *Conway*, 161 Vt. at 123, 636 A.2d at 741 (Dooley, J., dissenting) (relevant question is whether any change in conditions of imprisonment constitutes sufficiently grievous loss to trigger due process protection). We decline to adopt as a threshold test any of the legal catchwords — such as "grievous loss," "liberty interest," "entitlement," or "atypical and significant hardship" — that have marked the Supreme Court's due process jurisprudence.

Each of these phrases seeks to determine the point along the continuum of claimed interests at which due process protections are warranted. But labeling that point with a catchword does not aid the analysis. Rather, each case requires a fact-sensitive examination of the particular circumstances involved, including consideration of the nature and significance of the interest at stake, the potential impact of any decision resulting in a deprivation of that interest, and the role that procedural protections might play in such a decision.

Here, the interest involved is plaintiffs' anticipation of obtaining furlough before serving their minimum sentences. At least two

aspects of this interest reduce its significance. First, plaintiffs claim an interest in freedom from in-house confinement not only before the expiration of their sentences, but before expiration of their *minimum* release dates. As convicted prisoners, plaintiffs do not have a right to freedom from confinement during the period of their lawful sentences. See *Greenholtz*, 442 U.S. at 7 (given valid criminal conviction, prisoner's interest in being free from confinement has been extinguished). Any interest they have in freedom from confinement is even less significant before they serve their minimum sentences. See *Conway*, 161 Vt. at 116-17, 636 A.2d at 737 (finding qualitative difference between prisoners' interest in release from parole as opposed to furlough).

Second, plaintiffs are concerned with obtaining eligibility for furlough rather than maintaining an already realized conditional freedom. Conceding that they are not necessarily entitled to furlough, plaintiffs ask only for individual furlough assessments that may or may not result in their obtaining furlough. As Judge Henry Friendly cogently noted, "there is a human difference between losing what one has and not getting what one wants." H. Friendly, *Some Kind of Hearing*, 123 U. Pa. L. Rev. 1267, 1296 (1975). Without deciding whether revocation of furlough implicates due process protections under the Vermont Constitution, we conclude that plaintiffs' anticipation of furlough is a less significant interest than if they were defending against revocation of furlough. In short, plaintiffs have a sharply limited interest in obtaining individualized furlough assessments before serving their minimum sentences.

Plaintiffs make much of the probable negative impact of the denial of furlough consideration on whether they will be granted parole upon completing their minimum sentences. Although plaintiffs presented evidence indicating that a prisoner who has achieved furlough status is in a significantly better position to obtain parole, the fact remains that plaintiffs' anticipation of parole requires an additional level of speculation beyond their hopes of being furloughed. See *Berard v. Vermont Parole Bd.*, 730 F.2d 71, 73-74 (2d Cir. 1984) (neither mere possibility of release nor statistical probability of release creates legitimate expectation of release on parole); *Baumann v. Arizona Dep't of Corrections*, 754 F.2d 841, 844 (9th Cir. 1985) (statistical probability that particular treatment will be applied under regulations does not implicate due process protections). The evidence at the preliminary hearing was that the board has no categorical approach in deciding whether to grant parole, and that parole decisions concern

other factors besides whether the inmates were being held in community custody. Indeed, the evidence indicated that the board had denied parole to inmates who had been granted furlough, and had granted parole to inmates who had never been furloughed. In any event, as we stated in rejecting their statutory arguments, plaintiffs cannot bootstrap any protectible interest in parole that they might have onto a claimed interest in obtaining furlough before serving their minimum sentences. See *Bishop*, 667 A.2d at 279.

As for the role that procedural protections might play, plaintiffs complain that categorical exclusions will result in furlough being denied before the minimum release dates of violent felons who are in fact ready to be reintegrated into the community. We do not find this argument persuasive. As the United States Supreme Court stated in *Greenholtz*, "there simply is no constitutional guarantee that all executive decisionmaking must comply with standards that assure error-free determinations." 442 U.S. at 7. The Commissioner's categorical exclusion might preclude the release of violent felons who could have successfully reintegrated into the community before serving their minimum sentences, but it also will assure that violent felons who are not ready for reintegration into the community are not mistakenly released before they serve their minimum sentences.

Unlike revocation decisions, which most often turn on factual questions such as whether an inmate's misconduct violated conditions of release, release decisions involve a discretionary assessment of a multitude of factors that require subjective appraisals. See *id.* at 9-10 (comparing difference between release and revocation decisions). Procedural due process protections are less pivotal when the prisoner's status is subject to change without a showing of misconduct. See *Jenkins v. Fauver*, 528 A.2d 563, 567 (N.J. 1987) (noting that the Supreme Court has generally declined to extend due process protections in situations not requiring proof of misconduct); cf. *Conway*, 161 Vt. at 126, 636 A.2d at 742 (Dooley, J., dissenting) (when sole issue is whether inmate committed act that caused furlough revocation, and there are no questions of professional judgment or discretion, price of due process is small, while gain in protection against arbitrary action is great). Indeed, because the Commissioner has the authority to classify prisoners without regard to their individual disciplinary records, one could argue that providing plaintiffs with procedural due process protections would have served no useful purpose because the only factual issue to be resolved was whether plaintiffs had been convicted of violent felonies, a fact they do not dispute. See *Jenkins*, 528 A.2d at 571.

In considering the role that procedural protections might play, we recognize that plaintiffs' due process claim has both procedural and substantive overtones. It is procedural in the sense that plaintiffs are asking for a particular process — an individualized assessment. But it is also substantive in the sense that, in effect, they are claiming that the Commissioner violated due process by applying an impermissible categorical criterion to preclude them from obtaining individualized furlough assessments before their minimum release dates. See *Winsett v. McGinnes*, 617 F.2d 996, 1004 (3d Cir. 1980) (noting procedural and substantive overtones of due process claim); 2 R. Rotunda, J. Nowak & J. Nelson, Treatise on Constitutional Law § 14.6, at 13 (1986) (substantive review is concerned with constitutionality of underlying rule rather than fairness of process by which. government applies rule to individual).

■ In any event, whether their due process claim is substantive, procedural, or an amalgam of both, plaintiffs have failed to show that Chapter I, Article 10 of the Vermont Constitution prohibits the Commissioner from denying them furlough before their minimum release dates by classifying them based on the type of crime they committed. Given the nature of plaintiffs' interest, we conclude that plaintiffs were not entitled to procedural protections directly under the Vermont Constitution. Nor did § 808 entitle them to procedural protections under the Vermont Constitution, as evidenced by our construction of the statute above. Cf. *Lee v. Governor of New York*, 87 F.3d 55, 58 (2d Cir. 1996) (rejecting prisoners' due process claim challenging statute that prevented commissioner from allowing prisoners convicted of certain offenses to participate in work release program).

Further, to the extent that plaintiffs' due process claim is substantive in nature, it does not concern a fundamental constitutional right or suspect class; therefore, plaintiffs must demonstrate that there is no conceivable rational relation between the challenged regulation and a legitimate end of government. See R. Rotunda, *supra*, § 15.4, at 61-62 (challenged government act not involving fundamental right or suspect class will be upheld against substantive due process or equal protection claims unless no reasonable conceivable set of facts could establish rational relationship between challenged regulation and legitimate end of government); see also *Washington v. Harper*, 494 U.S. 210, 223 (1990) (even when fundamental constitutional right is involved, proper standard for determining validity of prison regulation is whether regulation is reasonably related to legitimate peno-

logical interests). The challenged policy of not allowing violent felons to obtain furlough before serving their minimum sentences was intended to protect the public and meet public expectations that offenders will serve their sentences. Unquestionably, a general rule requiring violent felons to serve their minimum sentences before becoming eligible for parole meets the rational basis standard. Cf. *Thornton v. Hunt*, 852 F.2d 526, 527 (11th Cir. 1988) (classification denying "good time" credits to prisoners serving sentences greater than ten years is rationally related to legitimate purpose of preventing early release of serious offenders).

█ The standard is the same under an equal protection analysis, and thus plaintiffs' equal protection claim also fails. See *Lorrain v. Ryan*, 160 Vt. 202, 212, 628 A.2d 543, 550 (1993) (when no fundamental right or suspect class is involved, test under Vermont Constitution's Common Benefits Clause is whether law is reasonably related to promotion of valid public purpose); see also *Baumann*, 754 F.2d at 846 (legitimate interest in deterrence and public perception of fair administration of justice allows states to base early release decisions on type of offense); *Mahfouz v. Lockhart*, 826 F.2d 791, 794 (8th Cir. 1987) (state's decision to exclude sex offenders from work release program is rationally related to legitimate government purpose of preventing sex crimes); *Hastings v. Commissioner of Corrections*, 674 N.E.2d 221, 226 (Mass. 1997) (classification policy met rational basis test even though prison officials did not submit factual proof that prisoners with life sentences who had been denied parole two or more times were more likely than other prisoners to attempt escape).

### III.

Plaintiffs may have anticipated obtaining furlough before serving their minimum sentences so long as their conduct conformed with their case plans, but "because of the unique circumstances that attend the administration of prisons, reasonable assumptions of inmates cannot always be equated with constitutionally protected interests." *Jenkins*, 528 A.2d at 570. Any such reliance on the part of plaintiffs did not prevent the Commissioner from altering the Department's furlough policy. The Commissioner has the authority to classify prisoners in administering the prison system. Considerations behind such classifications are peculiarly within the province and professional expertise of prison officials, and courts should ordinarily defer to their expert judgment in such matters. See *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979).

We must strike the appropriate balance between the need for the protection of prisoners' individual interests and the need for prison officials to undertake the difficult task of administering a prison system unhampered by unwarranted procedural burdens. See *Wolff*, 418 U.S. at 566 (recognizing that broad discretionary authority of prison officials is necessary for them to undertake extraordinarily difficult task of administering prison). If we were to accept plaintiffs' proposition that they are entitled to due process protections with respect to any prison policy having the potential to impinge directly or indirectly on inmates' conditions or length of confinement, we would subject to judicial review a wide spectrum of discretionary matters that are within the Commissioner's authority and expertise. See *Dominique v. Weld*, 73 F.3d 1156, 1160 (1st Cir. 1996); *Bishop*, 667 A.2d at 278. The Vermont Constitution does not require us to do so under the circumstances present in this appeal.

*Reversed and remanded.*

**Morse, J.,** dissenting. The Commissioner's policy carves out an exception to the furlough release program, rendering all offenders incarcerated for committing violent felonies ineligible for release on furlough until they have reached their minimum release date. Categorically denying furlough to a class of inmates is contrary to the intent of the Legislature in enacting 28 V.S.A. § 808(a). Therefore, I respectfully dissent.

The Court holds that the language of § 808(a) allows the Commissioner to make this categorical exception. See 28 V.S.A. § 808(a) ("commissioner may extend the limits of the place of confinement of an inmate at any correctional facility if in the judgment of the commissioner the inmate will honor his trust"). The Court reads the word "may" to connote both discretion whether to invoke furlough and, if invoked, whether to perform an individualized assessment. In my view, such a reading is too broad a construction of the Commissioner's authority, and one that disregards the statutory scheme governing the Department of Corrections. According to the Court, if the Commissioner is so disposed, he can withhold furlough from *any* "trustworthy" inmate, or any class of inmate for any or no reason whatsoever. This is obviously not what the Legislature had in mind. See *Vincent v. Vermont State Retirement Bd.*, 148 Vt. 531, 535, 536 A.2d 925, 928 (1987) (discretion granted by Legislature to administrative agency must not be "unrestrained and arbitrary") (citation omitted).

When words of common use are found in a statute, they are to be taken in their ordinary sense, unless a contrary intention is evident. See *State v. Levine*, 117 Vt. 320, 322, 91 A.2d 678, 679 (1952). Generally, in the construction of statutes, the plain, ordinary meaning of the word "may" indicates that it is discretionary and not mandatory. See *In re D.L.*, 164 Vt. 223, 234, 669 A.2d 1172, 1180 (1995). Nevertheless, the context in which the word appears must be the controlling factor. See Black's Law Dictionary 979 (6th ed. 1990) (noting the distinction between "may" and "shall"). In statutory construction, determining whether "may" is to be construed as imposing an absolute duty or merely a discretionary power, the true intent and purpose of the Legislature must be ascertained and given effect. See *Levine*, 117 Vt. at 323, 91 A.2d at 679-80. Thus, after examining legislative intent and purpose, in certain instances, the word "may" has the effect of "must." See *Richard v. Richard*, 131 Vt. 98, 102, 300 A.2d 637, 639 (1973) (although use of word "may" appears to be merely permissive, it would be inconsistent with spirit of act to construe it as permissive and not mandatory); see also 3 Sutherland Statutory Construction § 57.03, at 7 (5th ed. 1992) (although form of verb used in statute is single most important textual consideration in determining whether statute is mandatory or directory, it is not sole determinant; other considerations, such as legislative intent, can overcome ordinary meaning).

The interpretation of 28 V.S.A. § 808(a) as conferring upon the Commissioner complete discretion whether to undertake an assessment of an inmate's eligibility for furlough renders the statute superfluous. The Court finds no entitlement to individualized furlough assessment prior to their minimum release dates. The Court need not, however, find an "otherwise nonexistent statutory right," 170 Vt. at 269, 744 A.2d at 414, to recognize that the exclusion of an entire class of inmates from furlough assessment exceeds the bounds of the Commissioner's authority and shortchanges the Legislature's intent implicit in § 808(a) and expressed in other statutory provisions.

First, the Legislature has mandated that the Department of Corrections shall not only "implement a comprehensive program which will provide necessary closed custodial confinement of frequent, dangerous offenders," but also "establish as its *primary objective* the disciplined preparation of offenders for their responsible roles in the open community." 28 V.S.A. § 1(b) (emphasis added). Absolute exclusion of any class of inmates from consideration for furlough before their minimum release date ignores this primary objective.

Second, the Court has failed to reconcile 28 V.S.A. § 808(a) with 13 V.S.A. § 11a. Section 11a establishes a mechanism through which the State may seek greater penalties for those persons convicted of a third "felony crime of violence." Section 11a(e) specifically provides: "No person who receives a minimum sentence under this section shall be eligible for early release or furlough until the expiration of the minimum sentence." 13 V.S.A. § 11a(e). Statutes are to be considered in relation to one another when they "deal with the same subject matter or have the same objective or purpose." *Board of Trustees of Kellogg-Hubbard Library, Inc. v. Labor Relations Bd.*, 162 Vt. 571, 574, 649 A.2d 784, 786 (1994). Since both § 11a(e) and § 808(a) relate to the Commissioner's discretionary authority to assess furlough eligibility, they should be construed with reference to each other. Read together, the statutes illustrate that the Legislature retained the prerogative to exclude certain classes of inmates from § 808(a). Therefore, the Commissioner's challenged policy to exclude *all* inmates convicted of violent felonies from consideration under § 808(a) is an indisputable extension of his authority beyond the limits established in § 11a(e).

In addition to finding that the use of the word "may" does not entitle each inmate to a determination of furlough eligibility prior to his release date, the Court holds that any such determination undertaken by the Commissioner need not include an individual assessment of trustworthiness. Again, the Court focuses too narrowly on the word "may" to the exclusion of legislative intent. Under § 808(a), the Commissioner has discretion to grant a furlough to "an inmate" after determining that "the inmate" will be trustworthy. The use of the singular articles "an" and "the" prior to "inmate" by the Legislature denotes the individual significance of each inmate, plainly indicating the Commissioner's obligation to individually assess the merits for granting furlough status.

In another statute, the Legislature provided the Commissioner with discretion for addressing medical furloughs. See 28 V.S.A. § 808(f) ("commissioner shall develop a policy regarding the application for, standards for eligibility of and supervision of persons on medical furlough"). Had the Legislature wanted to grant the Commissioner the authority to develop standards for inmate eligibility for general furloughs, it would have done so. It did not, and the class of inmates excluded in this case is entitled to the attention the Legislature asked the Commissioner to provide.

Finally, the Court overlooks the practical impact of the Commissioner's policy. The Court acknowledges plaintiffs' evidence indicating

that prisoners who achieve furlough status are in a significantly better position to obtain parole compared to those who have not. Since furlough status may be granted during the three to six month period preceding a prisoner's minimum release date, exclusion from furlough consideration prior to this date in effect operates to lengthen the prisoner's sentence. In May 1995, the Commissioner had in his custody approximately 263 violent offenders who had not yet reached their minimum release dates. Lengthening sentences for a whole class of prisoners may result in significant costs. Such an effect begs the active involvement of both legislative and executive branches, rather than one branch to the exclusion of the other.

For the foregoing reasons, I would affirm the superior court's conclusion that the policy exceeds the Commissioner's discretionary authority under 28 V.S.A. § 808(a). The Court further holds that the policy does not violate plaintiffs' right to due process or equal protection under the Vermont Constitution. Since the policy exceeds, in my opinion, the authority vested in the Commissioner under § 808(a), this constitutional analysis is unnecessary. I am authorized to state that Justice Dooley joins in this dissent.